**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ROBERT PENA, SR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 11 C 3029 |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, *Commissioner* | ) | |
| *of Social Security*, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiff Robert Pena, Sr. seeks review of the final decision of the Commissioner of

Social Security (the "Commissioner") that denied his application for disability insurance benefits

under Title II of the Social Security Act (the "Act"). *See* 42 U.S.C. § 405(g). Before the Court

is Plaintiff's motion for summary judgment. For the following reasons, the Court grants

Plaintiff's motion. The final decision of the Commissioner is vacated, and this matter is

remanded to the Commissioner for further proceedings consistent with this Opinion.

## BACKGROUND

### I.     Procedural History

On July 20, 2007, Plaintiff filed an application for social security disability benefits,

alleging a disability onset date of May 29, 2007. The Social Security Administration ("SSA")

denied the claim initially on November 8, 2007, and again upon reconsideration on March 14,

2008. On September 30, 2009, pursuant to Plaintiff's written request, an administrative law

judge ("ALJ") conducted a hearing. In a written decision dated November 6, 2009, the ALJ

denied Plaintiff's application for benefits. The SSA Appeals Council thereafter denied review. On May 10, 2011, Plaintiff filed the present action against the Commissioner, seeking review of the denial of social security disability benefits. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

## II.     Factual Background

The following evidence comes from the record that was before the ALJ. Plaintiff was born in 1956 and has a ninth grade education. (A.R.[1] at 43-44.) He has previously worked as an oiler at a machine factory, a floor cleaner, and a machine operator. (*Id.* at 44-46.) On or about May 30, 2007, Plaintiff was admitted to the hospital, "present[ing] with throwing up, cough, chest pains." (*Id.* at 348.) The next day, Plaintiff underwent a "coronary artery bypass graft and did well postoperative." (*Id.* at 261.) The hospital discharged Plaintiff on or about June 6, 2007, with a diagnosis of "chest pain"; "diabetes mellitus"; and "alcohol abuse." (*Id.*)

### A.     Dr. Yatin Shah, M.D. – Treating Physician

On June 15, 2007, Dr. Yatin Shah, M.D. saw Plaintiff for a follow up visit to his hospitalization, and diagnosed him with hypertension, diabetes, and left heart failure. (*Id.* at 342-47.) Then, on July 20, 2007, Dr. Shah diagnosed Plaintiff with "diabetes with neurological manifestations." (*Id.* at 343.)

### B.     Dr. Muawia Martini, M.D. – Treating Physician

On August 6, 2007, Dr. Muawia Martini, M.D. saw Plaintiff for a hospital follow up visit, and reported that Plaintiff "denies any chest pain, tightness, heaviness, or pressure. No

---

[1]Citations to "A.R." refer to the Administrative Record filed in this Court as Docket Entry No. 15.

palpitations, dizziness, or syncope." (*Id.* at 362.) Dr. Martini additionally reported a history of depression and congestive heart failure, among other things, and recommended cardiac rehabilitation. (*Id.* at 363 (further noting that Plaintiff is "[d]oing well").) On March 4, 2008, Dr. Martini again saw Plaintiff for a follow up, at which time Plaintiff complained of fatigue and dyspnea with exertion. (*Id.* at 449.) Dr. Martini recommended that Plaintiff engage in exercise, noting that Plaintiff "did not go through cardiac rehab because of insurance reasons." (*Id.* at 450.) On August 25, 2008, Dr. Martini diagnosed Plaintiff with coronary artery disease, diabetes, and history of cardiomyopathy, hypertension, history of heart failure, and arthritis. (*Id.* at 451.) It appears that Dr. Martini saw Plaintiff on February 23, 2009, but the record is illegible. (*Id.* at 453-54.)

### C.     Dr. ChukwuEmeka Ezike, M.D. – SSA Consultive Examiner

In October of 2007, Dr. ChukwuEmeka Ezike, M.D. performed a consultive examination of Plaintiff at the request of the Bureau of Disability Determination Services. At that time, Plaintiff's "chief complaint" was "a history of coronary artery disease, arthritis, congestive heart failure, and neuropathy." (*Id.* at 376.) Dr. Ezike noted that Plaintiff experiences "occasional chest pain, which he describes as needle sticks on his chest, radiating to the neck and both upper extremities down to the fingers," in addition to "bilateral hand pain and stiffness with difficulty lifting." (*Id.* (further noting: "His hands get stuck when closed. He drops objects occasionally and has difficulty opening bottle tops and jars.").)

Based on an examination, Dr. Ezike's observations included the following: "trigger of the middle and ring fingers bilaterally [and] also mild medial tenderness of the right knee"; "unable to squat completely"; "diffuse tenderness of the leg bilaterally"; "able to get on and off

the exam table with no difficulty [and] could walk greater than 50 feet without support"; "gait was antalgic without the use of assistive devices"; "difficulty performing toe/heel walk due to bilateral lower extremity pain"; "able to pick up a nickel with each hand [but] has difficulty with grasping due to the trigger fingers in both hands"; "mild tenderness of the PIP joint of each finger"; "difficulty with extending the fingers after flexion but was able to make fists and appose the fingers"; and "range of motion of the shoulders, elbows, [wrists, hips, knees, and ankles] was normal." (*Id.* at 378.)

Dr. Ezike's mental status examination showed Plaintiff to be "alert and oriented to place, time and current date," and that his "[a]ppearance, behavior and ability to relate during the examination were normal." (*Id.*) Dr. Ezike further observed that Plaintiff was "appropriate, polite, pleasant and cooperative. The affect was normal. There were no signs of depression, agitation, irritability or anxiety." (*Id.*) Dr. Ezike concluded his report with seven "impressions": coronary artery disease, status post CABG; bilateral hand arthritis; trigger fingers; diabetes mellitus; hypertension; peripheral neuropathy; and right knee pain. (*Id.* at 379.)

**D.** **Dr. Francis Vincent, M.D. – SSA Reviewing Physician; Physical Residual Functional Capacity Assessment**

On November 5, 2007, Dr. Francis Vincent, M.D., a state agency reviewing physician, completed a Residual Functional Capacity Assessment ("RFC Assessment") on a pre-printed administrative form. (*Id.* at 381-88.) In the RFC Assessment, Dr. Vincent checked boxes corresponding to statements that Plaintiff, among other things, could "occasionally lift and/or carry" a maximum of 20 pounds; "frequently lift and/or carry" a maximum of 10 pounds; "stand and/or walk (with normal breaks)" for a total of 6 hours in an 8 hour workday; "sit (with normal breaks)" for a total of 6 hours in an 8 hour workday; and "push and/or pull (including operation

4

of hand and/or foot controls)" for an "unlimited" amount of time, "other than as shown for lift and/or carry."  (*Id.*)  Dr. Vincent, however, did not complete numerous sections of the RFC Assessment.  (*See* discussion *infra* at pages 17-19.)

### E.  Dr. Robert Prescott, Ph.D. – SSA Consultive Examiner; Formal Mental Status Examination

On February 21, 2008, Dr. Robert Prescott, Ph.D., a licensed psychologist, performed a "formal mental status examination" of Plaintiff at the request of the Bureau of Disability Determination Services.  (A.R. at 391.)  At that time, Plaintiff stated that he was not receiving mental health treatment, nor had he in the past.  (*Id.* at 391-92.)  As to Plaintiff's level of functioning, Dr. Prescott observed that although Plaintiff "can dress himself . . . , he is unable to tie his shoes," and he performs self-care "slowly."  (*Id.*)  Additionally, Dr. Prescott observed that Plaintiff "appeared to walk with a slight limp and moved slowly [and was] a little but [sic] unsteady on his feet.  He had brought his medicines in a ziplock bag which he had considerable difficulty opening up."  (*Id.*)

Dr. Prescott noted that Plaintiff "said he has been feeling depressed for the past 2 or 3 months because he can't pay his bills.  He said he cries once in awhile [and] is very irritable."  (*Id.* at 393-94.)  The doctor agreed that Plaintiff "did appear to be somewhat depressed."  (*Id.*)  Dr. Prescott further observed that Plaintiff reported being forgetful and confused at times.  (*Id.*)  Dr. Prescott concluded his report with a diagnosis of "major depression, moderate.  Learning disability, NOS, per history."  (*Id.*)

### F.  Dr. Norma Villanueva, M.D. – SSA Consultive Examiner; Internal Medical Examination

On February 28, 2008, Dr. Norma Villanueva, M.D., performed an "internal medicine

consultative examination" at the request of the Bureau of Disability Determination Services. (*Id.* at 415.) Plaintiff complained of shortness of breath, chest pain that radiates to his lower back and neck, numbness of the foot and legs, tingling sensations in his foot, and pain in his fingers. (*Id.*) Dr. Villanueva's examination revealed decreased sensation in Plaintiff's feet and lower legs, and a "full painless range of motion in degrees of all joints. . . . Ability to grasp, finger and manipulate with each hand was entirely normal." (*Id.* at 416.) Dr. Villanueva concluded by noting certain "clinical impressions": "diabetes mellitus with neuropathy, on medication; hypertension, controlled on medication; coronary artery disease, status post heart bypass, possibly had myocardial infarction; arthritis of the hands, on medication; depression – please refer to psychiatric evaluation for further information in this regard." (*Id.* at 416-17.)

### G. Dr. Frank Norbury, M.D. – SSA Reviewing Physician; Review of RFC

On March 13, 2008, Dr. Frank Norbury, M.D. affirmed the findings contained in the RFC Assessment that Dr. Vincent completed. (*Id.* at 397-98.) Dr. Norbury explained, based on a review of Plaintiff's medical file, that "[o]n reconsideration, there is found to be a decrease in sensation in both feet and lower leg. . . . Heart sounds are still normal. Claimant grip strength is normal, as is the ability to perform fine and gross manipulations." (*Id.* at 398.)

### H. Dr. Jerrold Heinrich, Ph.D. – SSA Reviewing Physician; Psychiatric Review Technique

On March 13, 2008, Dr. Jerrold Heinrich, Ph.D. found that Plaintiff's mental impairments were "not severe" pursuant to the Psychiatric Review Technique. (*Id.* at 399.) Dr. Heinrich further found the absence of any "degree of functional limitation," except that Plaintiff's mental disorders resulted in "mild" difficulties "in maintaining concentration, persistence, or pace." (*Id.* at 409.)

I. **Testimony at the Hearing Before the ALJ**

1. **Testimony of Plaintiff**

At the hearing before the ALJ, Plaintiff described "all day" pain in his hands that his doctors have been unable to manage with treatment. (*Id.* at 48 ("It's like a tingling. I get like shocks and my hands when I squeeze them they hurt and they lock, and I have to pry them back open.").) Plaintiff explained that he experiences pain when grabbing objects, and only infrequently is able to pick up a quarter or a nickel with his right hand. (*Id.* at 50.) Plaintiff is able to open a door and flip pages in a book, but cannot "hold something for a long time" because his "fingers get locked." (*Id.* at 51 (testifying that he can lift his 20 pound grandson "[o]nce in a while . . . [n]ot for long").) He is able to remove foil from prepared meals and insert items into the microwave. (*Id.*) Plaintiff does not have any warning about his hands locking up, and explained, "I just . . . my hands feel cold all the time so I rub them all the time." (*Id.* at 58.)

With regard to his legs, Plaintiff described numbness that he experiences "[a]ll the time" and pain in his feet that he experiences "most of the time." (*Id.* at 46 ("They get numb and like I – if I get hit on my legs or something with something I can't feel it. . . . I got a big cut on my leg or something and I don't know how I got it. Just numb all the way down.").) Plaintiff testified that it takes him 15 to 20 minutes to walk four blocks, and that he is unable to walk more than that distance because he gets tired and his legs hurt. (*Id.* at 50.) Plaintiff experiences problems when seated, and testified that "[m]ost of the time I don't sit very long." (*Id.* at 52.) He stated that he needed to stand up during the hearing because his legs "fall asleep and then I'm afraid that if I stand up I won't know and I'll fall down." (*Id.*) Plaintiff alternates his seated position every 30 to 45 minutes, and experiences difficulties when sleeping. (*Id.* ("My legs they keep me

up at night. Put them together and they hurt . . . . Get real bad shocks going to my feet. And I wake up and can't go back to sleep.").)

Plaintiff additionally testified that he feels depressed and has memory problems that cause him to "sometimes [] forget what I'm doing." (*Id.* at 54.) Plaintiff has not had any treatment for depression. (*Id.* at 55.)

### 2. Testimony of Vocational Expert

A vocational expert ("VE") testified that an individual of Plaintiff's age, education and work history, but with Plaintiff's limitations, would be unable to perform Plaintiff's past work. (*Id.* at 69-70.) The VE further testified, however, that such an individual could perform other work in the national economy, such as a carton packing machine operator, a stock checker, and a filing machine operator. (*Id.*)

## III. Decision of the ALJ

On November 6, 2008, the ALJ issued a written decision, concluding that Plaintiff had the following severe impairments: coronary artery disease, diabetes mellitus with neuropathy, and arthritis of the hands, but not major depression. (*Id.* at 18.) The ALJ further concluded that Plaintiff does not have an impairment, or combination of impairments, that meets or medically equals one of the impairments set forth in 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526.

The ALJ then assessed Plaintiff's Residual Functional Capacity ("RFC"). *See* 20 C.F.R. § 404.1545(a)(1) ("Your residual functional capacity is the most you can still do despite your limitations."). The ALJ discounted Plaintiff's testimony to the extent it was inconsistent with the RFC that the ALJ assigned to Plaintiff. The ALJ summarized the findings of Drs. Ezike, Villanueva, Vincent, and Norbury, and assigned "great weight" to their medical opinions and

observations.  (*Id.* at 20-24.)  The ALJ concluded:

> Due to the claimant's history of cardiovascular impairments and diabetic neuropathy, and his associated subjective complaints, the undersigned has limited the claimant to work at the light exertional level and below.  These same impairments would also allow for only occasional climbing of ladders, ropes, or scaffolds.  The claimant's hand arthritis would prevent him from constantly using his fingers or hands for manipulation or handling of objects.

(*Id.* at 24.)

Based on this RFC, and in light of Plaintiff's "age, education, [and] work experience," the ALJ concluded that "there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform."  (*Id.* at 25 (citing 20 C.F.R. § 404.1569).)  The ALJ accordingly determined that Plaintiff "has not been under a disability, as defined in the Social Security Act, from May 29, 2007 through the date of this decision," November 6, 2009.  (*Id.* at 26 (citing 20 C.F.R. § 404.1520(g).)  Plaintiff now seeks review.  *See* 42 U.S.C. § 405(g).

## LEGAL STANDARDS

### I.      Disability Standard

An individual is entitled to benefits under the Act if the individual is disabled.  *See* 42 U.S.C. § 423(a)(1); *Weatherbee v. Astrue*, 649 F.3d 565, 568 (7th Cir. 2011).  The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Liskowitz v. Astrue*, 559 F.3d 736, 739-40 (7th Cir. 2009) (quoting 42 U.S.C. §§ 423(a)(1)(E) and (d)(1)(A)).  As the Seventh Circuit has explained, "[a] claim of disability is determined under a sequential five-step analysis," specifically:

The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's [RFC] and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Craft v. Astrue*, 539 F.3d 668, 673-74 (7th Cir. 2008) (citing 20 C.F.R. § 404.1520); *see also*

*Chase*, 2012 WL 258192, at *2.

A claimant's RFC is "an administrative assessment of what work-related activities an individual can perform despite her limitations." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001); *see also* 20 C.F.R. § 404.1545(a)(1) ("Your impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what you can do in a work setting. Your residual functional capacity is the most you can still do despite your limitations."). In assessing a claimant's RFC, the ALJ "'must evaluate all limitations that arise from medically determinable impairments, even those that are not severe.'" *Milliken v. Astrue*, 397 Fed. App'x 218, 221 (7th Cir. 2010) (quoting *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009)); *see also Zatz v. Astrue*, 346 Fed. App'x 107, 111 (7th Cir. 2009) (stating that the ALJ must perform a functional assessment of all relevant limitations) (citing SSR 96-8P, 1996 WL 374184, at *4).

## II.    Standard of Review

An unsuccessful applicant for disability benefits may appeal to the district court. *See* 42 U.S.C. § 405(g). Under the Act, federal courts "have the statutory power to affirm, reverse, or

modify the Social Security Administration's decision, with or without remanding the case for further proceedings." *Allord v. Astrue,* 631 F.3d 411, 415 (7th Cir. 2011). Here, because the SSA Appeals Council denied Plaintiff's request for review, the Court reviews the ALJ's decision as the Commissioner's final decision. *See id.*; *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010).

The Court will uphold the Commissioner's decision if the ALJ applied the correct legal standards and substantial evidence supports the decision. *See Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). "Substantial evidence consists of 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Gooch v. Astrue*, No. 10-CV-478, 2012 WL 113790, at *2 (N.D. Ind. Jan. 12, 2012) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)).

"When reviewing for substantial evidence, [courts] do not displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (internal citation omitted). "The ALJ is not required to mention every piece of evidence but must provide an 'accurate and logical bridge' between the evidence and the conclusion that the claimant is not disabled, so that 'as a reviewing court, we may assess the validity of the agency's ultimate findings and afford [the] claimant meaningful judicial review.'" *Craft*, 539 F.3d at 673 (quoting *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004)).

## ANALYSIS

In this case, Plaintiff argues that the final decision of the Commissioner should "be reversed and remanded" because the ALJ "failed to properly determine Mr. Pena's RFC and

failed to properly develop the record," and "failed to properly evaluate Mr. Pena's credibility."[2] (Pl.'s Mem. at 9, 13.)

The ALJ concluded that Plaintiff "has the RFC to perform light work as defined in 20 C.F.R. [§] 404.1567(b)[,] except [that] he may only occasionally climb ladders, ropes, or scaffolds, and he is limited to frequent fingering and handling with either hand." (A.R. at 20.) The Code of Federal Regulations defines "light work" as involving

> . . . lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b); *see also Haynes v. Barnhart*, 416 F.3d 621, 627 n. 1 (7th Cir. 2005).

Beginning with the issue of credibility, a claimant's testimony is relevant to the ALJ's assessment of a claimant's RFC, *see Chase*, 2012 WL 258192, at *4, and the ALJ has a duty to properly evaluate and assess a claimant's credibility. *See Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009). Although federal courts will give great deference to the ALJ's credibility determinations, the ALJ must nonetheless "justify the credibility finding with specific reasons supported by the record." *Id.*; *see also* 20 C.F.R. § 404.1529(c). In a series of recent cases, the Seventh Circuit has held that it is reversible error for an ALJ to discount a claimant's credibility through the use of "meaningfulness boilerplate" language unaccompanied by cogent reasoning.

---

[2]Plaintiff additionally argues that the ALJ erred at step two in evaluating the severity of Plaintiff's mental impairments. The Court need not reach this additional argument. (*See* discussion *infra* at note 6.)

*See, e.g.*, *Bjornson v. Astrue*, — F.3d —, 2012 WL 280736, at *4 (7th Cir. 2012); *Punzio v. Astrue*, 630 F.3d 704, 709 (7th Cir. 2011); *Martinez v. Astrue*, 630 F.3d 693, 696–97 (7th Cir. 2011); *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010); *Spiva v. Astrue*, 628 F.3d 346, 348 (7th Cir. 2010).

In this case, the ALJ's manner of evaluating Plaintiff's credibility runs counter to these Seventh Circuit opinions. Plaintiff offered extensive testimony concerning the nature of his physical and mental limitations. (*See* discussion *supra* at pages 7-8.) Plaintiff's testimony was significant, as "RFC determinations are inherently intertwined with matters of credibility." *Outlaw v. Astrue*, 412 Fed. App'x 894, 897 (7th Cir. 2011). After summarizing Plaintiff's testimony, the ALJ dismissed much of its probative value in the following sentence:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(A.R. at 22.)

Just recently, the Seventh Circuit considered an ALJ's use of this exact language, characterizing it as "a piece of opaque boilerplate."[3] *Bjornson*, 2012 WL 280736, at *4. In

---

[3]Judge Posner introduced the issue with the following passage:

Reading the administrative law judge's opinion, we first stubbed our toe on a piece of opaque boilerplate near the beginning, where, after reciting Bjornson's description of her medical condition, the opinion states: "After careful consideration of the evidence, the undersigned [administrative law judge] finds that the claimant's medically determinable impairments would reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional

*Bjornson v. Astrue*, the Seventh Circuit found that the language was "even worse" than similar language that the Seventh Circuit has previously dismissed as "meaningless boilerplate." *Id.* (collecting cases). In reasoning that applies with equal force here, the Seventh Circuit explained:

> One problem with the boilerplate is that the assessment of the claimant's "residual functional capacity" (the bureaucratic term for ability to work) comes later in the administrative law judge's opinion, not "above"—above is just the foreshadowed conclusion of that later assessment. A deeper problem is that the assessment of a claimant's ability to work will often . . . depend heavily on the credibility of her statements concerning the "intensity, persistence and limiting effects" of her symptoms, but the passage implies that ability to work is determined first and is then used to determine the claimant's credibility. That gets things backwards.

*Id.*; *see also Canata v. Astrue*, No. 09 C 5649, 2011 WL 6780923, at *8 n. 9 (N.D. Ill. Dec. 23, 2011); *Longerman v. Astrue*, No. 11 CV 383, 2011 WL 5190319, at *15 (N.D. Ill. Oct. 28, 2011).

Indeed, here, as in *Bjornson*, Plaintiff's credibility was "critical" to the ALJ's "assessment of [Plaintiff's] ability to work, yet the boilerplate implies that the determination of credibility is deferred until ability to work is assessed without regard to credibility, even though it often can't be." *Bjornson*, 2012 WL 280736, at *5. In this regard, the *Bjornson* court observed:

> the tension between the "template" and SSR 96–7p(4), www.ssa.gov/OP_ Home/rulings/di/01/SSR96–07–di–01.html (visited Jan. 4, 2012), which states that "an individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence." The applicant's credibility thus cannot be ignored in determining her ability to work (her residual functional capacity, in SSA-speak).

────────────────────

> capacity assessment."

*Id.* at *4-5.

*Id.* at *4.

The ALJ's manner of proceeding in the present case reflects that the ALJ "first fashioned the RFC based on other evidence, and then simply dismissed any of [Plaintiff's] statements that did not fit into that pre-determined" concept. *See Collins v. Astrue*, No. 10 C 8067, 2011 WL 6318720, at *10 (N.D. Ill. Dec. 16, 2011) ("Finding statements that support the RFC credible and disregarding those that do not 'turns the credibility determination process on its head.'") (quoting *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787-88 (7th Cir. 2003)). The mere use of boilerplate language does not require remand in every case, but the ALJ in this case did not explain her conclusion in the body of the administrative decision so as to render the opening boilerplate language unsupported by the remainder of the decision. *See Bjornson*, 2012 WL 280736, at *4-6.

Although later in the decision, the ALJ stated that Dr. Villanueva's "clinical observations serve to diminish the credibility of the claimant's allegations with regard to the severity of his impairments," this statement is uninstructive. (A.R. at 24.) The statement does not identify the specific clinical observations that "diminish" the claimant's credibility, nor explain the degree of diminution, or how any such diminution affected the ALJ's assessment of Plaintiff's RFC. *Cf. Richison v. Astrue*, No. 11-2274, 2012 WL 377674, at *3 (7th Cir. Feb. 7, 2012) ("By explaining which of Richison's statements he did not credit and why, the ALJ provided a sufficient basis for his credibility assessment."). Additionally, it is unclear whether the "allegations" to which the statement refers are those allegations contained in Plaintiff's disability application, the statements he made at the hearing, the statements he made to any number of physicians, the arguments of counsel, or otherwise. *See Chase*, 2012 WL 258192, at *4 ("We are troubled by

the ALJ's failure to build a 'logical bridge' between the record and his credibility determination.").

The remainder of the ALJ's RFC analysis does not render the missteps in the evaluation of Plaintiff's credibility harmless. *See Eakin v. Astrue*, 432 Fed. App'x 607, 611 (7th Cir. 2011). Although the ALJ may make appropriate inferences from the record, "when an ALJ denies benefits, [s]he must build an 'accurate and logical bridge from the evidence to her conclusion.'" *Chase*, 2012 WL 258192, at *3 (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)). That did not occur here. *See Seamon v. Astrue*, 364 Fed. App'x 243, 247-48 (7th Cir. 2010) (stating that an ALJ's analysis should represent "a reasonable weighing of the evidence both for and against greater RFC limitations"). *Cf. Buckhanon ex. rel. J.H. v. Astrue*, 368 Fed. App'x 674, 680 (7th Cir. 2010) (upholding decision of the ALJ, where "the ALJ logically articulated the connection between that evidence and her conclusions").

The first examining physician, Dr. Ezike, made findings about Plaintiff's ability to perform certain physical tasks, while also observing significant physical limitations, including trigger of the middle and ring ringers bilaterally, reduced grip strength, difficulty grasping due to his trigger fingers, and difficulty extending his fingers. (A.R. at 378.) The ALJ interpreted Dr. Ezike's findings and observations – which did not include an opinion on Plaintiff's functional capacities – to conclude that Plaintiff's "impairments result in various work related limitations, mainly in the ability to perform manipulative actions and walk for long distances" but that "they nonetheless suggest a capacity to perform a wide range of work-related activities, as his neurological and musculoskeletal condition was essentially unaffected by his impairments." (*Id.* at 23.) The ALJ's discussion of Dr. Ezike's medical findings lacks an express connection

between the findings and the ALJ's assessment of Plaintiff's RFC. *See Duncan v. Apfel*, 248 F.3d 1157, at *1 (7th Cir. 2000) (table) (vacating decision of the ALJ because "the decision fails to adequately build a logical bridge connecting the evidence to his conclusion").

The same and additional problems exist as to Dr. Villanueva, who observed, among other things, a painless range of motion and decreased sensation of the feet and lower legs. (*Id.* at 416.) Dr. Villanueva did not opine on Plaintiff's ability to work. Although the ALJ need not discuss every piece of evidence in the record, the ALJ did not explain the significance of the decreased sensation that Dr. Villanueva observed, or otherwise explain how Dr. Villanueva's medical opinions affected or contributed to the ALJ's assessment of Plaintiff's RFC.[4] *See Bellinghiere v. Astrue*, No. 10 C 6184, 2011 WL 4431023, at *8 (N.D. Ill. Sept. 22, 2011) (remanding social security benefits decision, reasoning that "[n]owhere did the ALJ draw a direct connection between the facts of record and her conclusions, or . . . 'build an accurate and logical bridge from the evidence to the conclusion'") (quoting *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008)).

To the extent the Commissioner argues that the ALJ "reasonably relied on the state agency opinion" of Dr. Vincent (Comm'r Resp. at 9 (citing 20 C.F.R. § 404.1527(f)(2)(I); SSR 96-6p, 1996 WL 374180, at *2)), the Commissioner's argument is belied by the record. Dr. Vincent checked boxes on a pre-printed form corresponding to certain functional limitations, and

---

[4]Additionally, the probative value of the medical records from Dr. Villanueva is somewhat limited by considerations of time. Dr. Villanueva examined Plaintiff in February of 2008, months after Plaintiff's alleged disability onset date of May 29, 2007, and Dr. Villanueva did not purport to offer any medical opinion on Plaintiff's physical condition as it existed between May 29, 2007 and the date of his examination. *See, e.g.*, *Webster v. Astrue*, 580 F. Supp. 2d 785, 794 (E.D. Wis. 2008) (finding minimal relevance to a report that "postdates the relevant disability period").

summarized some of the medical evidence in the record, but he left important sections of the form completely unanswered, including:

> [§ I.A., "External Limitations"]  Explain how and why the evidence supports your conclusions in items 1 through 5.  Cite the specific facts upon which your conclusion are based.

> [§ I.C., "Manipulative Limitations"]  Describe how the activities checked 'limited' are impaired.  Also, explain how and why the evidence supports your conclusions in Item 1 through 4.  Cite the specific facts [on] which your conclusions are based.

> [§ II, "Symptoms"]  For symptoms alleged by the claimant to produce physical limitations, and for which the following have not previously been addressed in section I, discuss whether:

>> A.  The symptom(s) is attributable, in your judgment, to a medically determinable impairment.
>> B.  The severity or duration of the symptom(s), in your judgment, is disproportionate to the expected severity or expected duration on the basis of the claimant's medically determinable impairment(s).
>> C.  The severity of the symptom(s) and its alleged effect on the function is consistent, in your judgment, with the total medical and nonmedical evidence, including statements by the claimant and others, observations regarding activities of daily living, and alterations of usual behavior of habits.

(A.R. at 382, 384, 386.)

The incomplete nature of the RFC Assessment casts serious doubt on its evidentiary value, and this is an issue that the ALJ should explore on remand.[5]  *See, e.g.*, *Hurt v. Astrue*, No. 07 CV 1209, 2009 WL 382532, at *5 (S.D. Ind. Feb. 12, 2009) (holding that ALJ was not

---

[5]The Commissioner additionally points to Dr. Norbury, who affirmed the RFC Assessment that Dr. Vincent completed.  Not only would the incomplete nature of the underlying RFC Assessment seemingly frustrate Dr. Norbury's review, but also the ALJ does not appear to have meaningfully relied on Dr. Norbury in assessing Plaintiff's RFC.  Indeed, the ALJ's decision simply states that Dr. Vincent's "assessment was affirmed by a second State agency examiner in March of 2008."  (A.R. at 23-24.)  This statement is vague and overlooks certain modifications that Dr. Norbury made to Dr. Vincent's RFC Assessment, including Dr. Norbury's statement that, on "reconsideration, there is found to be a decrease in sensation in both feet and lower left."  (*Id.* at 398.)

entitled to rely on doctor's disability opinions, where "[o]n the RFC questionnaire, [the doctor] left the answer blank when asked to identify the clinical findings, laboratory and test results which demonstrated Hurt's medical impairments"); *Jackson v. Barnhart*, No. 01 C 7387, 2003 WL 21011798, at *9 (N.D. Ill. May 5, 2003) ("The mere fact that Dr. Gonzalez checked various boxes on a preprinted form indicating that Jackson could perform medium work does not render his unexplained opinion substantial evidence of Jackson's abilities.") (citing *Dixon*, 270 F.3d at 1177 (holding that a treating physician's opinion was not entitled to controlling weight where she merely answered "yes" in response to a pre-typed question)).

Even if the medical findings in the record, taken together, are consistent with the ALJ's assessment of Plaintiff's RFC, she did not "explain what she found instructive in the findings" and, of course, "the agency may not bolster the ALJ's ruling with evidence the ALJ did not rely on." *Eakin*, 432 Fed. App'x at 611-12 (citing *Campbell*, 627 F.3d at 307). The ALJ's factual summary of the record, followed by a conclusion, without more, does not suffice as substantial evidence. *See Bjornson*, 2012 WL 280736, at *6-8 (citing 20 C.F.R. § 404.1527(e)(2) ("Although we consider opinions from medical sources on issues such as . . . your residual functional capacity . . . the final responsibility for deciding these issues is reserved to the Commissioner.").)

## CONCLUSION

For all of these reasons, the Court vacates the final decision of the Commissioner, and remands this action to the Commissioner for further proceedings consistent with this Opinion. "None of this is to say that a conclusion that [Plaintiff] is not disabled would be indefensible." *Banks v. Bernhart*, 63 Fed. App'x 929, 935 (7th Cir. 2003). Remand is instead "required for the

ALJ to fully articulate the reasons supporting [the] RFC determination and ensure that determination is properly supported" by substantial evidence, *see Hatchett v. Astrue*, No. 10 CV 2133, 2011 WL 3876920, at *11 (N.D. Ill. Aug. 31, 2011), and based upon a proper evaluation of the credibility of Plaintiff's testimony, *see Bjornson*, 2012 WL 280736, at *6-8.

On remand, the ALJ shall "reevaluate Plaintiff's complaints of pain" and functional limitations, with due regard for the full range of medical evidence and the appropriate weight to be accorded his testimony. *See Thomas v. Astrue*, No. 09 C 7581, 2011 WL 5052049, at *11 (N.D. Ill. Oct. 19, 2011) (citing *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001)). Consistent with SSR 96-8P, 1996 WL 374184, the ALJ's assessment of Plaintiff's RFC should taken into account all of Plaintiff's impairments, both physical and mental, whether severe or not severe.[6] *See Hatchett*, 2011 WL 3876920, at *11 ("[W]hen determining the RFC, the ALJ must consider all medically determinable impairments, physical and mental, even those that are not considered 'severe.'") (citing 20 C.F.R. §§ 404.1545(a)(2), (b), (c); *Craft*, 539 F.3d at 676). The ALJ's decision should reflect a logical bridge between the evidence and the ALJ's conclusion. *See Chase*, 2012 WL 258192, at *3.

---

[6]Plaintiff additionally challenges the ALJ's conclusion at step two that his mental impairments were not severe. (Pl.'s Mem. at 5-9.) Specifically, Plaintiff argues that the ALJ erred by relying on (1) the findings of Dr. Heinrich, a non-examining physician, rather than the findings of Dr. Prescott, an examining physician; and (2) Plaintiff's failure to seek formal mental health treatment. (*Id.*) Plaintiff's arguments may be well-taken. *See Stopka v. Astrue*, No. 10 C 5326, 2012 WL 266341, at *1 (7th Cir. Jan. 26, 2012) (observing that step two is "a *de minimis* screening device that disposes of groundless claims") (collecting cases); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003); *Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989) ("[I]t is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation"). The Court, however, need not reach the merits of Plaintiff's arguments in light of the disposition of this case. On remand, the ALJ will approach step two anew, and in any event, must consider Plaintiff's mental impairments – whether severe or not – for purposes of assessing Plaintiff's RFC. *See* 20 C.F.R. §§ 404.1545(a)(2), (b), (c).

Additionally, the ALJ should consider on remand whether to take additional evidence to ensure that the decision is supported by substantial evidence. *See Griffin v. Barnhart*, 198 Fed. App'x 561, 564 (7th Cir. 2006) (holding the ALJ has "discretion in deciding when and how he should order additional evidence," and noting that this discretion does not "relieve an applicant entirely of his own responsibility for supporting his claim").

Plaintiff's motion for summary judgment is granted. The final decision of the Commissioner is vacated and the case is remanded to the Commissioner for further proceedings consistent with this Opinion.

**Date:** February 27, 2012

**ENTERED**

**AMY J. ST EVE**
**United States District Court Judge**